UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| **CARLA WEST,**<br>　　Plaintiff,<br>v.<br>**GENERAL MOTORS COMPANY, INC,** *et al.*,<br>　　Defendants. | **Case No. 1:25-cv-1111-CLM** |

## MEMORANDUM OPINION

Plaintiff Carla West bought a Chevrolet Yukon from Defendants Ryan and Crystal Carter. West says that, before the sale, the Carters told her that the automatic tailgate on the Yukon was safe and functioning properly. But eventually the tailgate malfunctioned and injured West. So West sued the Carters and Defendant General Motors ("GM") in Alabama state court, asserting various state-law claims. (Doc. 1-1). GM removed the case to this court based on diversity, (doc. 1), and West now moves to remand, (doc. 5). For the reasons explained below, the court **GRANTS** West's motion to remand. (Doc. 5).

## BACKGROUND[1]

In February 2020, Carla West bought a 2007 Chevrolet Yukon from Ryan and Crystal Carter. The Yukon was equipped with an automatic tailgate feature, which allows an operator to open the rear hatch of the Yukon hands-free. The automatic tailgate is designed to open to the top and hold its position until it closes automatically. And if an obstruction prevents the automatic tailgate from closing, it is supposed to detect the obstruction and immediately reopen.

West alleges that the Carters told her the automatic tailgate was

---

[1] Because West move to remand, the court draws its facts from the complaint and views them in the light most favorable to the plaintiff. *See Crowe v. Coleman*, 113 F.3d 1536, 1538 (11th Cir. 1997).

safe and functioned properly. West believed them and bought the Yukon. West owned the Yukon for over two years without incident. But on July 19, 2022, that changed. While West was unloading items from the trunk of the Yukon at her home in Etowah County, Alabama, the automatic tailgate unexpectedly slammed shut on her midsection and caused her substantial injuries.

On July 17, 2024, West sued the Carters and General Motors Company Inc. (properly identified as General Motors LLC) in the Circuit Court of Etowah County, Alabama. West asserts claims of negligence, wantonness, and a violation of the Alabama Extended Manufacturer's Liability Doctrine (AEMLD) against GM. West asserts claims of fraud and misrepresentation against the Carters. West says that she relied on the Carters' representations that the automatic tailgate was safe and functioning properly. And when the Carters made them, they knew or should have known those representations were false. Although West does not specify a specific dollar amount in her complaint, West seeks judgment "in an amount that exceeds the jurisdictional minimum of [the Circuit Court for Etowah County, Alabama], and which the factfinder may determine, including compensatory and punitive damages, plus interest and all costs of this proceeding." (Doc. 1-1, pp. 78-80).

West properly served GM on June 10, 2025. GM promptly removed the case to this court based on diversity subject-matter jurisdiction. GM is a Delaware limited liability company that, through its ownership structure, is a citizen of Delaware and Michigan. West is a citizen of Alabama. So are Ryan and Crystal Carter, which would destroy diversity jurisdiction. On top of that, the federal removal statute requires that all defendants consent to removal, see 28 U.S.C. 1446(b)(2)(A), and the Carters never consented. GM attempts to shuffle past this jurisdictional hurdle by asserting that West fraudulently joined the Carters as defendants, so their consent is not required and the proper parties—West and GM—are completely diverse. West pushes back, arguing that GM has not proven that the statutorily required amount in controversy is met, that the Carters were properly joined, and the Carters' lack of consent to

removal is fatal. So West moves to remand. (Doc. 5).

## STANDARD OF REVIEW

Federal district courts are courts of limited jurisdiction. "They are empowered to hear only those cases within the judicial power of the United States as defined by Article III of the Constitution, and which have been entrusted to them by a jurisdictional grant authorized by Congress." *Univ. of S. Ala. v. Am. Tobacco Co.*, 168 F.3d 405, 409 (11th Cir. 1999) (internal quotation omitted). So a court "should inquire into whether it has subject matter jurisdiction at the earliest possible stage in the proceedings." *Id.* at 410. "[R]emoval jurisdiction is no exception" to this obligation *Id.* Indeed, "once a federal court determines that it is without subject matter jurisdiction, the court is powerless to continue." *Id.*

"A removing defendant bears the burden of proving proper federal jurisdiction." *Leonard v. Enter. Rent a Car*, 279 F.3d 967, 972 (11th Cir. 2002). And "[b]ecause removal jurisdiction raises significant federalism concerns, federal courts are directed to construe removal statutes strictly." *Univ. of S. Ala.*, 168 F.3d at 411. "[A]ll doubts about jurisdiction should be resolved in favor of remand to state court." *Id*.

GM premises its removal upon this court's diversity jurisdiction. Diversity jurisdiction exists where the suit is between citizens of different states and the amount in controversy exceeds the statutorily prescribed amount of $75,000. *See* 28 U.S.C. § 1332(a). So for removal jurisdiction based on diversity, GM must establish: (1) a complete diversity of citizenship between West and the Defendant(s); and (2) satisfaction of the amount in controversy requirement. If GM fails to prove either of these jurisdictional elements, the court must remand.

As to the first element, complete diversity requires that "every plaintiff must be diverse from every defendant." *Palmer v. Hosp. Auth.*, 22 F.3d 1559, 1564 (11th Cir. 1994). That is, no plaintiff may be a citizen of the same state as any defendant. Then for the quantitative element, the amount in controversy, excluding interests and costs, must exceed

$75,000. 28 U.S.C. § 1332(a). In many cases, the amount in controversy calculus is obvious from the plaintiff's complaint. This case isn't one of them.

Where, as here, the plaintiff has not pleaded a specific amount of damages, "the removing defendant must prove by a preponderance of the evidence that the amount in controversy exceeds the jurisdictional minimum." *Pretka v. Kolter City Plaza II, Inc.*, 608 F.3d 744, 752 (11th Cir. 2010). In assessing whether the defendant has met this burden, the court should first consider whether it is "facially apparent" from the complaint that the amount in controversy exceeds $75,000. *See id.* at 754. If it is not, the court should look to the removal notice and may examine accompanying evidence provided by the defendant. *See id.* There are no limits to the types of evidence a defendant may offer in this context. *See id.* at 755. The defendant may introduce their own affidavits, declarations, or other documentation. *See id.* And the court may draw inferences, deductions, and extrapolations from such evidence to resolve the jurisdictional question. *See id.* at 754.

At bottom, while "a removing defendant is not required to prove the amount in controversy beyond all doubt or to banish all uncertainty about it," *id.*, the burden still rests with GM. And because "all doubts about jurisdiction should be resolved in favor of remand to state court[,]" *Univ. of S. Ala.*, 168 F.3d at 411, if GM does not sufficiently carry its burden, the tie goes to Plaintiff West.

## DISCUSSION

The court needn't discuss fraudulent joinder because the court lacks jurisdiction based on the amount in controversy. As laid out above, GM must prove by a preponderance of the evidence that West has put more than $75,000 into controversy. To do so, GM points to two sources of evidence: (1) West's pleadings, and (2) a series of social media posts that West published documenting her medical treatment. Taken together, GM suggests that these items prove by a preponderance of the evidence that West's claims exceed $75,000. Addressing each item in turn, the court

explains why this evidence *suggests* that West *may* seek more than $75,000, but the evidence doesn't *prove* the necessary amount by a preponderance of the evidence.

**I. The Pleadings**

Let's start with the complaint. In it, West does not specify the dollar amount that she seeks. Rather, in her prayers for relief, West asks for judgment "in an amount that exceeds the jurisdictional minimum of [the Circuit Court for Etowah County, Alabama]." (Doc. 1-1, pp. 78-80). GM argues that West's reference to the "jurisdictional minimum" in Etowah County Circuit Court means that she is seeking at least $20,000. (*See* doc. 1, pp. 25-26). But as West correctly points out, this isn't necessarily true. The jurisdictional minimum of an Alabama Circuit Court is $6,000.[2] So, standing alone, that West's claim exceeds the "jurisdictional minimum" in state court is no clear indication that the amount in controversy rises to the $75,000 required for jurisdiction in this court.

Next is West's claim for punitive damages. "When determining the jurisdictional amount in controversy in diversity cases, punitive damages must be considered, unless it is apparent to a legal certainty that such cannot be recovered." *Holley Equipment Co. v. Credit Alliance Corp.*, 821 F.2d 1531, 1535 (11th Cir. 1987) (citations omitted). GM asserts that the amount in controversy is satisfied because West seeks punitive damages against GM on top of her compensatory damages. (Doc. 1, p. 25). But GM simultaneously explains why West cannot recover punitive damages from GM as a matter of law:

> [T]he alleged incident here involves "Old GM" conduct, for which punitive damages cannot be recovered. *See Butler Wooten & Peak LLP v. GM LLC (In re Motors Liquidation Co.)*, 943 F.3d 125, 127 (2nd Cir. 2019) (holding "New GM"

---

[2] *See* Alabama Code § 12-11-30(1) ("The circuit court shall have exclusive original jurisdiction of all civil actions in which the matter in controversy exceeds twenty thousand dollars ($20,000) … and shall exercise original jurisdiction concurrent with the district court in all civil actions in which the matter in controversy exceeds six thousand dollars ($6,000) …").

> is not liable for punitive damages with respect to claims arising from accidents allegedly involving automobiles manufactured by "Old GM" (*i.e.*, General Motors Company prior to the sale of its bulk assets pursuant to a 2009 bankruptcy action)).

(*See id.* at n.5). West seemingly concedes that she cannot recover punitive damages. (*See* doc. 8, p. 1) ("If, as GM suggests, **and Plaintiff has not disputed**, Plaintiff cannot recover punitive damages because of GM's bankruptcy, then Plaintiff's punitive demand is a nullity and cannot be used to support removal.") (emphasis added). If West cannot recover punitive damages against GM, those damages are not "in controversy" and the court cannot consider them. So the punitive damages claim doesn't get GM closer to the $75,000 threshold.

Finally, the court examines a factor that *does* weigh in GM's favor but, in isolation, is not enough. GM points out that West has refused to stipulate (in her pleadings, briefing, or otherwise) that she seeks less than $75,000. The Eleventh Circuit has held that "a refusal to stipulate standing alone does not satisfy [the removing defendant's] burden of proof on the jurisdictional issue." *Williams v. Best Buy Co., Inc.*, 269 F.3d 1316, 1320 (11th Cir. 2001). "But this does not mean that a court may never consider a refusal to stipulate—just that it may not rely on it *alone* to conclude that the required amount in controversy exists." *Sullins v. Moreland*, 511 F. Supp. 3d 1220, 1229 (M.D. Ala. 2021). So while this argument helps GM, it cannot create jurisdiction by itself.[3]

Having addressed the arguments for the amount in controversy in the pleadings, the court moves to West's description of her injuries and her social media posts.

---

[3] The court suggests a different approach to avoid this problem. Before removing the case, GM could have propounded written discovery that asked West to admit or deny that she was seeking more than $75,000. *See* Ala. R. Civ. P. 36. If West admitted it, GM could have timely removed the case under 28 U.S.C. § 1446(b)(3). If West denied the request, then GM would have evidence that may prove helpful later.

## II. The Social Media Posts

While West's complaint lacks specific allegations as to the nature and extent of her injuries, it does allege that she sustained "substantial injuries" as the result of the automatic tailgate "slam[ming] shut on her midsection." (Doc. 1-1, p. 77, ¶ 14). So to get a better picture of West's injuries and the potential value of her claims, GM scoured through West's Facebook page to find a series of posts in which West described her life from the day of her injury until she returned home. Relying on these posts, GM says that "it is fair to assume that the costs of [West's] medical bills alone total well over $75,000[,]" not to mention the "additional damages for pain and suffering, mental anguish, or potential lost wages." (Doc. 1, p. 23). But taking a closer look, that assumption is not as fair as GM might think.

The first Facebook post came 10 days after the accident. (*See* Doc. 1-3). In it, West explains how the "hatch back fell/broke" and "slammed shut" on her, that she thought she "broke" her back, and that she then went to the hospital or her doctor's office where she underwent an initial X-ray and MRI. (*Id.*) West said that the MRI "didn't show anything but a mild bulging disc & L4-L5 which showed it was chronic in my Lumbar spine." (*Id.*) She then explained that she initially had "a few episodes of bladder incontinence," was in "severe pain," and could "barely walk." (*Id.*)

West then continued through the events of the next week, explaining that these events overlapped with the one-year anniversary of her ovarian cancer diagnosis. While the court regrets airing West's medical history, it must because it provides needed context. For example:

> \*\* Monday I went to my Cancer doctor he ordered a lot Blood test, CT of my pelvic abdomen and chest and told me to get and endoscopy and a colonoscopy ASAP . He also looked at my notes and MRI disc from my accident and said it was not related to my cancer/ female stuff .

(*Id.*) Two days later, West went to the emergency room.

> \*\*Wednesday, July 27,2022 I came to St. Vincents East ER , I fell that morning as my legs have been given out also as well as me stumbling around , and I had again loss of bladder . When I got here they got me back and a started running more test I had a MRI of my lumber spine  with and without contast, thoracic and Cervical MRI as well . He did say the MRI I had last week compared to this one had changed some , he did say he saw some me chronic but the accident from the back hatch slamming on me exacerbated what was already there plus  caused  me to have the Cauda Equina Syndrome Symptoms ( since I had no pain and nothing for years prior to this )  They have drawn blood and urine etc . \*They did tell me that he is pretty sure I have. I am in the SICU here at St. Vincent's East at the moment .

(*Id.*) And the day after that, West's physicians consulted "Neuro and Ortho spine." (*Id.*) "They ordered an MRI of [West's] brain and a Lumbar puncture which he is **checking the fluid for Cancer, MS, and an Auto immune disorder.**" (*Id.*) (emphasis added).

In her motion to remand, West argued that the "lengthy Facebook post, at best it reveals an ovarian cancer survivor suffering from incontinence who had an aggravation of existing injury." (Doc. 5, p. 5). So GM pulled together more social media posts in response. GM included several posts in the body of their brief, including these:

**Carla Bobo West** is with **Michael West** and **15 others**.
July 31, 2022

Update on my condition 7/31/22–
I have a crush injury to my nerves in spine . It has caused me to lose all control of my bowels and bladder , also me being to walk very good , I can pivot with help but can't walk . He told me I could be incontinent permanently, it could be for a few months , years or it could be a few weeks he really doesn't  know at this time  . I will be having a colonoscopy and endoscopy done tomorrow . He is setting me up with a urogynocologist at UAB ASAP . A Urologist did come in to talk me also. My O2 is dropping so of course I'm on Oxygen  and my heart rate keeps dropping for some reason also . I am still in St.Vincent's as of right now . Please continue to pray for me and my family during this time . I am still waiting on the MS , Autoimmune and Cancer culture to come back from the lumbar puncture that was done one 7/28/22 . Love to you all .

 176         159 comments   6 shares

**Carla Bobo West**
August 2, 2022

8/2/22 update : you all know I have a crush injury to my spine . They are going to try and get me into Encompass Health in Gadsden so it will be closer to home . I have a long rough road ahead of me and my Neuro Surgeon said I would need pain management to help with all this pain . I just want to say thank you from the bottom of my heart for all the prayers , thoughts etc . I have felt them . Love to you all

 119         42 comments   5 shares

(Doc. 7, p. 5). But one post GM included in its exhibits—but omitted from the body of the brief—stood out:



(Doc. 7-1, p. 2) (emphasis added). Because this is the most recent of West's social media posts in the record, it leaves the court with more questions than answers when deciding what caused West's health issues.

>Here is what we do know from West's posts:
>
>(1) She says she was in severe pain from the accident;
>(2) She sought treatment and underwent tests;
>(3) She says she had a "mild bulging disc" in her spine;
>(4) She had bladder incontinence;
>(5) West had previously been diagnosed with ovarian cancer;
>(6) Based on her symptoms, West's physicians tested her for cancer, multiple sclerosis, and an auto immune disorder; and,
>(7) West was then diagnosed with colon cancer.

And this is what we don't know: The extent that West's health issues and resulting treatments stem from the accident as opposed to her underlying conditions. While *some* of West's treatment resulted from her accident and back injury, it appears that many of the follow up tests and treatment occurred because doctors discovered potentially cancerous abnormalities in West's colon from the initial X-Ray and MRI on her back.

>So was the majority of West's medical treatment a derivative of the accident? Or was it because of her colon cancer? If West had to stay in the hospital for treatment, was it because of her back injury or the cancer screenings? The court is neither an oncological nor accident reconstruction expert. And GM—who bears the burden of proving jurisdiction—has

offered no evidence beyond West's posts that would allow the court to choose. So the court cannot find that GM has proved the requisite amount.

―――

The court admits this is a close call. Upon remand, it may become obvious that West's lawsuit puts $75,000 into controversy. That result may even be likely. But that's mere speculation; the court cannot *know* that based on the limited evidence the parties present. "[T]his court is not allowed to speculate about the damages plaintiff hopes to recover in an Alabama court, or to guess what an Alabama jury might do." *Smith v. Baseball Players Ass'n, Inc.*, No. 4:22-CV-1454-CLM, 2024 WL 2303733, at *4 (N.D. Ala. May 21, 2024) (quoting *Mitchell v. SunTrust Mortg., Inc.*, 673 F. Supp. 2d 1317, 1319 (N. D. Ala. 2009)). And "all doubts about jurisdiction should be resolved in favor of remand to state court." *Univ. of S. Ala.*, 168 F.3d at 411. The court is therefore required to remand the case to state court because this court lacks jurisdiction.

That doesn't mean the issue is dead, however. The case may become removable if GM receives "an amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable," and GM may then file a notice of removal within 30 days. 28 U.S.C. § 1446(b)(3). As noted (*see* n.3), such papers often become available in discovery in the court where the case began.

## CONCLUSION

For these reasons, the court finds that it lacks subject matter jurisdiction and thus **GRANTS** West's motion to remand. (Doc. 5). The court will enter a separate order that instructs the Clerk of Court to remand and close this case. *See* 28 U.S.C. § 1447(c).

**DONE** and **ORDERED** on March 10, 2026.

_____
**COREY L. MAZE**
UNITED STATES DISTRICT JUDGE